IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| AUDREY K. BUCK,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Commissioner of Social Security,<br><br>Defendant. | CV-14-235-M-DLC-JCL<br><br>FINDINGS & RECOMMENDATION |

Plaintiff Audrey Buck brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Buck alleges disability since December 2006, due to insomnia, macular degeneration, fibromyalgia, high blood pressure, anxiety, acid reflux, and depression. (Tr. 47, 201). Buck's claim was denied initially and on reconsideration. (Tr. 136, 143). Buck appeared with counsel at an administrative hearing in front of an administrative law judge (ALJ) on January 16, 2013. (Tr. 38-116 ). On February 22, 2013, the ALJ issued a decision finding Buck not disabled within the meaning of the Act. (Tr. 22-32). The Appeals Council denied Buck's

-1-

request for review, making the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 7-12). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Buck was 45 years old at the time of her alleged onset date, and 52 years old at the time of the ALJ's decision.

## I.     Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the

Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II. <u>Burden of Proof</u>

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the

impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii).

If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III. Discussion

The ALJ found at step one that Buck met the insured status requirements of the Act through September 30, 2012, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 24). At step two, the ALJ found that Buck had the following severe impairments: fibromyalgia, macular degeneration, depression, and anxiety. (Tr. 24). The ALJ concluded at step three that Buck did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. (Tr. 24-25). The

ALJ also found that Buck's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. (Tr. 29-30). The ALJ concluded that Buck had the residual functional capacity to perform light work "except she is unable to understand, remember, and carry out complex and detailed instructions." (Tr. 27). Based on that residual functional capacity assessment, the ALJ found at step four that Buck was capable of performing past relevant work as a laundress and packager as actually performed. (Tr. 30). The ALJ made alternative findings at step five, concluding that Buck was also capable of performing light unskilled work as a bench assembler, motel cleaner, or delicatessen clerk. (Tr. 31).

### A. Duty to Develop the Record

Buck argues the ALJ failed to adequately develop the record regarding her mental impairments because he assessed her degree of limitation in each of the four functional areas specified in 20 C.F.R. § 404.1520a without ordering a consultative evaluation or eliciting medical expert testimony.

It is undisputed that an "ALJ in a social security case has an independent "'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.

2001) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). But that duty is triggered only when "there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). *See also Nguyen v. Commissioner of Social Sec.*, 2008 WL 859425 *7 (E.D. Cal. 2008). Furthermore, whether to order a consultative evaluation or additional testing is left to the ALJ's discretion. *See* 20 C.F.R. §§ 404.1519a, 416.919a; *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). The ALJ is not required to order such a consultative examination unless such an examination is necessary to enable the ALJ to make an informed disability determination. *See* 20 C.F.R. §§ 404.1519a.

The ALJ found at step two that Buck's depression and anxiety were severe impairments. Having done so, the ALJ was required to document his application of the special technique for evaluating mental impairments and make a specific finding as to the degree of limitation in each of four areas: activities of daily living; ability to maintain social functioning; concentration, persistence, and pace; and deterioration or decompensation. 20 C.F.R. § 404.1520a. The ALJ addressed Buck's limitations in these four areas at step three and while assessing Buck's residual functional capacity. He found that Buck's activities of daily living were mildly restricted based on evidence that she cared for two dogs, fixed simple

meals, cared her for own grooming and hygiene, did small loads of laundry, light cleaning, drove, and went shopping with her husband. (Tr. 27, 53, 217, 218). The ALJ also found it significant that for approximately three years after her alleged onset date Buck babysat for her grandson approximately 30 hours per week, and cared for her grandson after school in the afternoons. (Tr. 26, 54-55, 193).

The ALJ similarly found that Buck's mental impairments caused mild restrictions in social functioning, noting there was no evidence of overt hostility towards others or social isolation, and Buck was able to leave her home to care for her grandson, attend water therapy, medical appointments, and shop. (Tr. 26,215, 65-66). With respect to concentration, persistence or pace, the ALJ found Buck had mild to moderate limitations based on evidence that she was able to attend to her daily activities and appointments, pay bills, and handle a checking and savings account. Finally, the ALJ found no evidence that Buck had experienced any episodes of decompensation of extended duration.

Buck argues the ALJ was not qualified to assess her limitations in these four functional areas and should have ordered a consultative mental evaluation. Buck cites *Padilla v. Astrue*, 541 F.Supp.2d 1102, 1106 (C.D. Cal. 2008) for the proposition that an ALJ is a lay person who is "not qualified to interpret raw

medical data in functional terms." But the ALJ was not interpreting "raw medical data." He permissibly found based in large part on Buck's testimony and function report that her mental impairments resulted in no more than mild to moderate limitations.

The record regarding Buck's alleged mental impairments was not ambiguous or inadequate. Treatment notes from Buck's primary care physician, Dr. John Tremper, and nurse practitioners at the same clinic mention depression and anxiety, but reflect that Buck's symptoms were well-controlled on medication. (See e.g. Tr. 328, 330, 332, 348, 350, 400, 406, 418). On September 15, 2010, for example, Buck was pleasant, happy, and doing very well on Citalopram. (Tr. 330-31). The ALJ discussed these medical records in his decision, noting that Buck's complaints of depression were managed with Citalopram prescribed by Dr. Tremper. (Tr. 28). There is no evidence that Dr. Tremper ever recommended that Buck see a psychologist or counselor. The medical and other evidence of record, including that as it pertained to Buck's anxiety and depression, was sufficient for the ALJ to make an informed decision. Because the ALJ had adequate and unambiguous evidence upon which to base his decision, he was not required to further develop by ordering a consultative examination.   .

**B.   Medical Opinions**

Buck argues the ALJ erred by not giving more weight to a physical capacities assessment form completed by Dr. Tremper.

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

The Commissioner may disregard a treating physician's opinion whether or not that opinion is contradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ may accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751.

Dr. Tremper examined Buck for the first time in August 2011, at which time he assessed her with fibromyalgia and insomnia. (Tr. 334). Dr. Tremper saw

Buck approximately eight more times in between October 2011 and October 2012. (Tr. 334-41, 348-51, 358-59, 400-07). In September 2012, Dr. Tremper completed a physical capacities assessment form provided by Buck's counsel. (Tr. 364). Dr. Tremper indicated that Buck could sit for a maximum of ten minutes total in an 8-hour day, could stand and walk for a total of only 30 minutes in an 8-hour day, and could lift and carry a maximum of three pounds. (Tr. 364).

Buck argues the ALJ did not provide sufficient reasons for rejecting Dr. Tremper's opinion as set forth on this fill-in-the blank, check-box form.[1] The ALJ considered Dr. Tremper's opinion but assigned it little weight in large part because it was inconsistent with his treatment notes, which did not support such extreme limitations. (Tr. 30). Dr. Tremper's records reflect that he saw Buck a handful of times for routine follow up visits and medication refills (Tr. 348, 350, 400, 404). At their other visits, Buck presented with a variety of complaints, ranging from diarrhea (Tr. 336) and bowel problems (Tr. 340) to fibromyalgia (Tr. 406). Dr. Tremper made no significant findings on general examination, and he consistently described Buck as "pleasant," "alert and oriented," "well" and "in no acute distress." (Tr. 336, 340, 348, 350, 400, 404, 406). As the ALJ also pointed

---

[1] Because Dr. Tremper's opinion was contradicted by that of the state agency physician (Tr. 123), the ALJ could reject it for specific and legitimate reasons.

out, Dr. Tremper's opinion as to the severity of Buck's physical limitations was inconsistent with his advice that she continue with her excises and water therapy. (Tr. 328-29). The ALJ reasonably decided that Dr. Tremper's opinion as to the severity of Buck's physical limitations was not supported by his treatment records and discounted it on that basis. *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (ALJ may reject treating doctor's opinion when treatment notes "provide no basis for the functional restrictions" identified in the opinion).

The ALJ discounted Dr. Tremper's opinion because it was apparently based in part on Buck's subjective complaints. While Dr. Tremper's records reflect that he generally examined Buck during each visit, the ALJ pointed out there was no evidence that Dr. Tremper conducted any objective testing to assess her abilities. (Tr. 30). As discussed below, the ALJ provided sufficiently clear and convincing reasons for finding Buck less than entirely credible. Having done so he permissibly discounted Dr. Tremper's opinion to the extent it was based on Buck's subjective complaints. See *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (explaining that where the ALJ has properly determined that a claimant's description of her limitations was not entirely credible, the ALJ could reasonably discount a physician's opinion "that was based on those less than

credible statements.").

These were sufficiently specific and legitimate reasons for discounting Dr. Tremper's opinion.

## C. Credibility

Buck argues the ALJ did not provide sufficiently clear and convincing reasons for finding her testimony only partially credible.

If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted). Buck met her initial burden because she provided evidence that she has underlying impairments that could reasonably be expected to produce some degree of symptoms, and the ALJ did not find that she was malingering.

Buck testified that she is unable to work due to pain, exhaustion, and weakness. (Tr. 65). Buck said she typically spends her day sitting in her recliner, watching television, and letting the dogs in and out of the house. (Tr. 53). She

explained that approximately 20 to 30 minutes after she gets up in the morning, she often feels "so wiped out and exhausted" that she "can hardly move," and that she then has to rest in her recliner with her feet elevated, which makes her mad and frustrated. (Tr. 65). She also described participating in a physical pool therapy pool class three times a week and babysitting her grandson after school three days a week. (Tr. 53-54).

    The ALJ found that Buck's testimony as to the disabling severity of her impairments was not fully supported by the medical evidence. (Tr. 29). For example, the ALJ noted that while Buck complained of neck, shoulder, and upper back pain, x-rays were negative. (Tr. 28). And while Buck reported muscle aches and joint stiffness in September 2010, she was found to be in no acute distress on physical examination and had normal strength, sensation, an peripheral pulses. (Tr. 28). And in contrast to Buck's allegations of disabling pain, her medical records consistently reflect that she was in no acute distress. (Tr. 28, 330, 336, 350, 400, 404, 406, 418). While subjective testimony cannot be rejected based solely on the lack of objective medical evidence is one relevant factor for the ALJ to consider when assessing credibility. *See e.g. Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ also cited evidence that Buck engaged in activities suggesting she was capable of doing more than she claimed. For example, while Buck testified that she was unable to work due to pain, exhaustion, and weakness, the ALJ found it significant that for three years after her alleged onset date she was able to babysit her grandson approximately 30 hours a week. The ALJ noted that Buck's current activities also included going to her daughter's house in the afternoons to care for her grandson, fixing simple meals, doing light cleaning, and small loads of laundry. The ALJ reasonably found the fact that Buck was able to engage in those daily activities undermined her testimony that she was in so much pain that she had to spent much of the day in a recliner, could not lift more than three pounds, and could only walk two blocks.

The ALJ also discounted Buck's testimony based on her conservative course of treatment. (Tr 29). While Buck testified that she suffered from debilitating pain, the ALJ observed that her primary care providers had never referred her to a specialist for care. (Tr. 29). *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding the severity of an impairment"). In addition, the ALJ reasonably found Buck's allegations that she could not work due

to exhaustion and weakness were overstated, particularly in light to of the fact that there were "no such dramatic statements in the medical records." (Tr. 29).

These were sufficiently clear and convincing reasons, supported by substantial evidence, for finding Buck less than entirely credible.

**D.     Lay Testimony**

Buck argues the ALJ failed to provide germane reasons for rejecting the testimony of Buck's daughter, Melissa.

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)).  "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919).

At the administrative hearing, Melissa testified that that Buck could not sit, stand, or hold her up her head for more than five or ten minutes.  (Tr. 90).  The ALJ reasonably found this testimony was not supported by the medical records. (Tr. 29).  The ALJ also discredited Melissa's testimony that Buck had to lie down

due to anxiety on the ground that there was nothing in Dr. Tremper's records reflecting that Buck's anxiety was that severe, and because she had never been referred to a specialist or to mental health treatment. (Tr. 29). These were germane reasons for rejecting Melissa's lay testimony

### E. Vocational Expert

Buck maintains the ALJ failed to include all of her limitations in the hypothetical question he posed to the vocational expert and failed to reconcile a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). SSR 00-4p governs the use of vocational expert evidence in disability determinations, and states that "[o]ccupational evidence provided by a VE...generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, * 2. If "there is an apparent unresolved conflict between VE...evidence and the DOT," the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE" testimony to support a disability determination. SSR 00-4p, *2. An ALJ's failure to ask about a conflict is harmless if the record shows there is no conflict. *Massachi v. Astrue*, 486 F.3d 1149, 1154 n. 19 (9th Cir. 2007).

The ALJ found that Buck had the residual functional capacity to perform

light work, but she was unable to understand, remember, and carry out complex and detailed instructions. (Tr. 27). The vocational expert testimony the ALJ relied on in finding there were other jobs Buck could perform was in response to a hypothetical asking about a full range of light work. (Tr. 99-102). Because the hypothetical did not include the limitation on understanding, remembering, and carrying out complex instructions, Buck argues the ALJ's hypothetical was flawed and the ALJ erred by relying on the vocational expert's testimony and finding that she could perform the jobs of bench assembler (DICOT 706.684-042, 1991 WL 679055), motel cleaner (DICOT 323.687-014, 1991 WL 672783), and deli clerk (DICOT 316.684-014, 1991 WL 672744), as set forth in the DOT.

While the Court agrees the ALJ erred by not asking the vocational expert if a person who is unable to understand, remember, and carry out complex and detailed instructions could perform those jobs, the error was harmless. All three jobs are identified in the DOT as "SVP 2", which equates to unskilled work. Unskilled work in turn accounts for a limitation of following only short, simple instructions. See Social Security Ruling ("SSR") 85-15, 1985 WL 5687, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions..."); 20 C.F.R. § 416.968(a) (defining unskilled work as work that

needs little or no judgment and consists of simple duties that can be learned on the job in a short period of time). Because the jobs identified by the vocational expert were unskilled, and thus accounted for the limitation on understanding, remembering and carrying out complex instructions, the ALJ's error in failing to include that limitation in the hypothetical was harmless.

## IV. Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS RECOMMENDED that Buck's motion for summary judgment be DENIED and the Commissioner's decision be affirmed.

DATED this 23rd day of June, 2015

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge